# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LADAMIEN LAVELLE MALONE, | ) | CASE NO. 5:23-cv-2273 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| CITY OF AKRON, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Ladamien Lavelle Malone ("Malone") was arrested for obstructing justice and resisting arrest after a dispute with a neighbor. (*See* Doc. No. 1 (Complaint).) During that arrest, he alleges that City of Akron Police Officers Adam Smith ("Officer Smith"), John Edwards, III ("Officer Edwards"), Sean Gregg ("Officer Gregg"), Davor Karac ("Officer Karac"), and Edward Patalon ("Sgt. Patalon") (collectively the "Officers") violated his constitutional rights. (*See id*.) He also claims that the City of Akron (the "City") and the Akron Police Department (the "Department") have a policy or custom that led to the violation of those rights. (*See id.*) The Officers, asserting qualified immunity, move for summary judgment on each of Malone's claims. (Doc. No. 47.) The City and Department also seek summary judgment, arguing that Malone has failed to make out a *Monell* claim. (Doc. No. 48.) Malone opposes both motions (Doc. Nos. 55, 56), and all defendants replied. (Doc. Nos. 59, 60.) For the reasons explained below, the City and Department's motion and the Officers' motion are **GRANTED**.

## I.  BACKGROUND

Before detailing the facts of this case, a brief explanation as to where those facts come from. "Ordinarily in summary-judgment appeals involving qualified immunity (like this one)," the Court views "the facts in the light most favorable to the plaintiff." *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (citing *Scott v. Harris,* 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)). But in cases like this one involving body camera footage, the Court views the events "in the light depicted by" video evidence. *Scott*, 550 U.S. at 378–81. That said, if there are "gaps or uncertainties" in the video evidence, the Court reverts to Malone's version of events. *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017).

On the afternoon of November 27, 2021, Malone was standing outside of his home, "lecturing" his son about his recent behavior in school. (Doc. No. 47-6 (Malone Deposition), at 21:4–13.)[1] Malone's mother took issue with the way Malone was addressing his son, so she began to argue with Malone. (*Id.* at 21:14–20; *see id*. at 30:5–7 (describing the encounter as an "argument").) At some point, Malone found out that his next-door neighbor was recording the argument. (*Id.* at 21:21–23.)

One dispute turned into another. Unhappy, Malone asked the neighbor, "[w]hy are you recording me lecturing my son?" (Doc. No. 47-6, at 21:21–25.) The neighbor replied that he could "record whatever" because he was on his own property. (*Id.* at 22:1–2.) That prompted Malone to briefly enter his house to retrieve his cell phone. (*Id.* at 22:2–3; 36:8–9.) When he did, the neighbor flashed a gun at Lakeia Hardges (Malone's girlfriend) and Malone's daughter, who remained

---

[1] Malone and the Officers filed Malone's deposition transcript as exhibits to their summary judgment briefing. (*See* Doc. No. 47-6; Doc. No. 55-1; Doc. No. 56-1.) Throughout this opinion, the Court refers to Doc. No. 47-6 when referencing Malone's deposition. Page number references are to the consecutive page numbers applied by the Court's electronic filing system. Line number references are those applied by the court reporter.

outside. (*Id.* at 22:4–9.) Upset by that development, Malone again questioned Jones: "[w]hat you doing with a gun?" (*Id.* at 22:10–13.) The neighbor, in turn, called 911. (*Id.* at 22:14–17.)

Officers Smith, Edwards, Gregg, and Karac—each wearing a body camera—responded. (Doc. No. 47-1 (Smith Declaration), at 14 (Ex. A-4, Smith BWC); Doc. No. 47-2 (Edwards Declaration), at 9 (Ex. B-2, Edwards BWC); Doc. No. 47-3 (Gregg Declaration), at 8 (Ex. C-2, Gregg BWC); Doc. No. 47-4 (Karac Declaration), at 6 (Ex D-2, Karac BWC); *see also* Doc. No. 47-5 (Patalon Declaration), at 103 (Ex. E-3, Patalon BWC).) Officers Smith and Edwards spoke with the neighbor, who claimed that Malone had flashed a gun at him. (*See, e.g.*, Smith BWC, at 2:17–6:40.)[2]

Meanwhile, Officer Karac (with Officer Gregg close behind) approached Malone, who immediately said he was not "gonna put [his] hands on [him] or nothing." (Karac BWC, at 2:50–55.) When the Officers began to talk to Malone, he told a different story. (*See, e.g.*, Gregg BWC, at 3:04–6:48.) While in a very agitated and animated state, he denied flashing a weapon, instead insisting that it was his neighbor who "had his gun outside." (*Id.* at 3:55–4:20, 4:36–4:43, 5:13–5:55.) Hardges reiterated that it was the neighbor—and not Malone—who had a gun. (*See, e.g.*, *id.* at 3:55–4:05.) At several points, Malone took his cell phones out of his pockets and raised his shirt. (*Id.* at 5:19–5:21, 6:07–6:11; *see also* Doc. No. 47-6, at 23:1–3.) During the exchange, Malone paced on his covered front porch, and the Officers remained in his front yard, several feet way. (*See* Gregg BWC, at 3:04–6:48.) Throughout the encounter, Malone appeared agitated, gestured with his hands, raised his voice, and frequently used profanity. (*See id.* at 3:04–6:48.) By contrast Officers Karac and Gregg remained calm as they did throughout the encounter. (*Id.*)

---

[2] The Officers filed available body camera footage as exhibits to their declarations. (*See* Doc. No. 49 (Notice of Manual Filing).) For ease of reference, the Court will cite to body camera footage using the relevant Officer's name and time stamps associated with the video (as opposed to the 24-hour time indications embedded in the footage).

After several minutes, Officer Smith (who had been next door talking to the neighbor) joined Officers Gregg and Karac in Malone's front yard. (Smith BWC, at 6:50.) Malone continued to deny having a gun and implicated the neighbor. (*See, e.g.*, *id.* at 7:23–7:35, 8:08–8:10.) He also refused to provide his name and said he would not answer any other questions. (*See, e.g.*, 7:00–7:22, 7:35–7:50, 8:47–8:52; Doc. No. 47-6, at 23:13–17.) Malone continually shouted over Officer Smith when he tried to speak. (Smith BWC, at 6:55–9:10.) At one point, Officer Smith asked Malone if they could talk without shouting and tried to tell Malone that "everything [he] said [was] correct." (*Id.* at 8:51–8:53.)

After about six minutes, Malone remained uncooperative, and Officer Smith walked from the front yard toward Malone's front porch. (*Id.* at 9:00–9:05.) As Officer Smith made his way up the steps to the porch, Officer Smith again informed Malone that he wanted to talk to him, but Malone told him not to "come over here asking [him] nothing[.]" (*Id.* at 9:05–9:11.) Malone then quickly entered his house and shut the door behind him. (*Id.* at 9:11–9:13.) Quickly, though, he remerged and directed Hardges and his daughter (who were still outside) to enter the house. (*Id.* at 9:14–9:19.) Officer Smith reiterated that he "just want[ed] to talk" with Malone and grabbed the exterior door handle. (*Id.*; Gregg BWC, at 9:07–9:10.) Uninterested, Malone said "no" and started to reenter the house. (Smith BWC, at 9:17–9:19.) Up to that point, Malone was never told he was under arrest or that he was not free to leave, nor was a weapon ever seen. (*See, e.g.*, Gregg BWC, at 3:04–9:10.)

Before Malone reentered the house, Officer Smith "grabbed [Malone's] right arm and took him to the floor of the porch" so that Malone could not go "inside his home where a gun may have been present." (Doc. No. 47-1, at 2.) The parties dispute what happened during the takedown. Malone asserts that he hit his head on a brick pillar on the front porch. (Doc. No. 47-6, at 24:18–

4

20), while the Officers believe the "video evidence shows [Malone] was taken to the floor of his porch without striking his head[.]" (Doc. No. 59, at 3.) Because none of the available footage shows the position of Malone's head during the entirety of the takedown,[3] the Court accepts Malone's assertion that his head struck the brick pillar while he was taken to the ground. (Doc. No. 47-6, at 24:18–20.) In the end, however, this dispute is immaterial.

Once on the ground, Malone claims that the Officers unnecessarily jumped "on top of him while he was already face down and not going anywhere[.]" (Doc. No. 56, at 14; *see* Doc. No. 47-6, at 84:14–15 ("I just hit the ground, and put my hands behind my back."), 85:2–3.) The Officers, by contrast, claim that Malone "resisted [their] efforts to handcuff him." (Doc. No. 47, at 17 (citing Doc. No 47-3, at 9; Doc. No. 47-4, at 7).) In the initial moments after the takedown, the videos show the Officers engaged in a brief struggle with Malone. (*See, e.g.*, Gregg BWC, at 9:16–10:05; Smith BWC, at 9:25–10:15; Edwards BWC, at 9:17–10:00.) Officers moved Malone's arms to a position to be handcuffed and Officer Gregg briefly placed a knee "on top of [Malone's] middle back for control" (as stated in his Use of Force/Resisting Arrest Report), but removed the knee after about 10 seconds, well before Malone's hands were secured. (Doc. No. 47-3, at 9; *see, e.g.*, Gregg BWC, at 9:16–10:05; Smith BWC, at 9:25–10:15; Edwards BWC, at 9:17–10:00.) At one point, Malone was also informed that he was under arrest and directed to stop resisting. (*See, e.g.*,

---

[3] "When opposing parties tell two different stories," a court can look to video evidence to the extent it "blatantly contradict[s]" one party's version of events. *Scott*, 550 U.S. at 380. Here, once Officer Smith starts to pull Malone to the ground, his body camera is intermittently obscured by the scuffle. (Smith BWC, at 9:21–9:30.) So too is Officer Karac's. (Karac BWC, at 9:05–9:15.) Officer Gregg turned away from the front porch briefly when Officer Smith pulled Malone to the ground, and Malone's head is not consistently visible once Gregg makes his way to the front porch. (Gregg BWC, at 9:10–9:25.) And Officer Edwards was still next door talking to the neighbor when the takedown began. (Edwards BWC, at 9:10–9:18.) On the video provided by Malone, his head is hidden behind the Officers' bodies during the takedown. (Doc. No. 56, at 8 n.1 (Ex. B), at 0:26–0:35.) There is no point where Malone's head can be seen hitting the post, but there is also not an unobstructed view of his head during the entire footage of the takedown. It is certainly possible that Malone was taken to the ground without hitting his head, but available video evidence does not "blatantly contradict[]" Malone's account. *Scott*, 550 U.S. at 380. Under the *Scott* standard, the Court must view that "gap[] or uncertaint[y]" in the light most favorable to Malone. *Latits*, 878 F.3d at 544. But, in any event, this fact dispute is not material, because the law was not clearly established.

Smith BWC, at 9:31–9:33.) At several points, the video shows Malone arguing with the Officers and moving his body while on the ground—in direct contradiction of his assertion that he simply "hit the ground." (*See, e.g.*, Gregg BWC, at 9:16–10:05; Smith BWC, at 9:25–10:15; Edwards BWC, at 9:17–10:00.)

Malone also claims that Officer Smith got "on [his] back trying to put his arm around [Malone's] mouth[,]" that another officer landed on his arm, and that still another officer kneeled on his back while he was handcuffed. (Doc. No. 47-6, at 24:18–25:9.) Body camera video shows otherwise. To be sure, Officer Smith was on Malone's back, but his arms were not around Malone's mouth. (*See, e.g.*, Smith BWC, at 9:25–9:35; Edwards BWC, at 9:17–9:22.) Video also shows that Officer Gregg had a knee on Malone's back, but it was removed well before Malone was fully handcuffed. (Smith BWC, at 9:38–10:05.) Once his arms were secure, Malone alleges that Officer Smith "acted as if he was trying to loosen the cuffs up, and [] put his forearm on [Malone's] back and lifted up . . . injuring [Malone's] spine." (Doc. No 47-6, at 25:10–13.) But again, body camera footage shows that when Malone was lifted up, Officer Smith was already standing and never put a forearm on Malone's back or tried to loosen his handcuffs. (Smith BWC, at 10:05–10:15; Gregg BWC, at 9:43–10:09.)

Once Malone was handcuffed, the Officers walked him to a police vehicle. (Smith BWC, at 10:15–12:42.) Malone remained animated and profane, at several points resisting the Officers' attempts to place him in the car. (*Id.*) Because the Officers had used force, an ambulance was called for Malone as a matter of course. (Doc. No. 47-1, at 15.) As the ambulance arrived, Malone claimed that "[his] head hurt, [his] back hurt, [and his] arm hurt[.]" (Doc. No. 47-6, at 27:1–5.) But after speaking to medical personnel and undergoing a brief exam, Malone declined any treatment. (*Id.* at 27:6–10; *see* Gregg BWC, at 18:10–20:50.) Sgt. Patalon, who was called to the scene to

complete a use of force investigation, concluded that the Officers' use of force was reasonable. (Doc. No. 47-5, at 107–09.) Ultimately, Malone was charged with obstruction of justice and resisting arrest, but not for any offense involving a firearm. (Doc. No. 47-1, at 13.)

As a result of the Officers' use of force, Malone claims that he suffered a saccular aneurysm; closed head injury; acute post-traumatic headaches; sprains of his cervical, thoracic, and lumbar spine, ribs, and sternum; strains of muscle and tendon in his left rotator cuff; groin pain; and bilateral femur pain. (Doc. No. 56, at 11 (citing Doc. No. 56-3 (Dr. Haynesworth Report)).)

This lawsuit followed. Malone claims that the Officers violated his constitutional rights by using excessive force and denying him sufficient medical treatment. (Doc. No. 1 ¶¶ 46–52.) He also brings a *Monell* claim[4] against the City and Department. (*Id.* ¶¶ 53–61.) The Officers, believing they are entitled to qualified immunity, move for summary judgment. (Doc. No. 47, at 9–22.) The City and Department also seek summary judgment, arguing that Malone has offered no evidence to support his *Monell* claim. (Doc. No. 48, at 9–17.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought[,]" and that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Alternatively, summary judgment is denied if "there are 'any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party[.]'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th

---

[4] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the record—including pleadings, depositions, written discovery responses, and affidavits—that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Fed. R. Civ. P. 56(a), (c). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Anderson*, 477 U.S. at 248–49. Instead, the nonmoving party must "go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. In determining whether those standards are met, the "court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255. But the "mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to avoid summary judgment. *Id*. at 252. Put differently, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* Ultimately, the inquiry is "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id.*

## III.    DISCUSSION

### A.    Section 1983 Claims against the Officers

Malone claims that the Officers violated his constitutional rights by using excessive force in arresting him, and by exhibiting deliberate indifference to his medical needs once he was in custody. (Doc. No. 1 ¶¶ 46–52; Doc. No. 56, at 13–20.) The Officers assert that they are entitled to qualified immunity on both claims because no constitutional violations occurred, and that even if they had, Malone's rights were not clearly established. (Doc. No. 47, at 9–22.)

"Qualified immunity shields public officials from personal liability under § 1983 unless they 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 326 (6th Cir. 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)), *cert. denied,* 144 S. Ct. 692, 217 L. Ed. 2d 388 (2024). "At summary judgment, a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Jackson-Gibson v. Beasley*, 118 F.4th 848, 853 (6th Cir. 2024) (citation and quotation marks omitted). Applying those standards here, the Court concludes that the Officers are entitled to immunity.

#### 1.    *Excessive Force Claim Against the Officers*

Start with the excessive force claim. The Fourth Amendment prohibits excessive force during an arrest. *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989). "Whether an officer exerts excessive force is determined under an objective reasonableness standard[,]" as "judged from the perspective of a reasonable officer at the scene, and not from the 20/20 vision of hindsight." *Jackson-Gibson*, 118 F.4th at 854 (citations and quotation marks omitted). That viewpoint is important, because "police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The objective reasonableness standard recognizes that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396 (citation and quotation marks omitted).

To determine whether force was reasonable, the Court must "consider the totality of the circumstances and specifically address: (1) the severity of the crime; (2) the suspect's immediate threat to officers or others; and (3) whether the suspect [was] actively resisting or evading arrest." *Jackson-Gibson*, 118 F.4th at 854 (citing *Graham*, 490 U.S. at 396). Ultimately, that multi-factor analysis helps to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up).

When determining whether officers used excessive force, there is "no easy-to-apply legal test or on/off switch[,]" so the Court must "slosh its way through a factbound morass." *Barnes v. Felix*, 605 U.S. ----, 145 S. Ct. 1353, 1358 (2025) (cleaned up). If the plaintiff offers some evidence that generates a genuine fact dispute as to any of the *Graham* factors, a jury must resolve those disputes to determine whether a constitutional violation occurred. *See, e.g.*, *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (finding, for example, that if "there is some evidence—more than a mere scintilla of evidence—that [an arrestee], through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he posed a serious threat of harm, a genuine fact dispute is created").

As the Officers see it, there are no fact disputes as to any of the *Graham* factors, and all three support their use of "minimal" force. (Doc. No. 47, at 14–17.) They contend, "[b]ased on the

10

totality of the facts and circumstances," that they used objectively reasonable force in taking Malone to the ground and in detaining him once he was on the ground. (*Id.* at 17.) For his part, Malone counters that a "reasonable jury could surely conclude from [the] record that in each instance the force applied to Malone by [the Officers] was unreasonable under the circumstances[.]" (Doc. No. 56, at 15.)

Ordinarily, courts evaluate the reasonableness of force in segments, separately analyzing each application of force by each officer. *Smith v. City of Troy, Ohio*, 874 F.3d 938, 944 (6th Cir. 2017). Here, the Court will analyze the use of force in two segments: first, the takedown of Malone by Officers Smith and Karac, and second, the force used by Officers Smith, Karac, Gregg, and Edwards once Malone was on the ground. *See, e.g., Laury v. Rodriguez*, 659 F. App'x 837, 843 (6th Cir. 2016) (analyzing takedown and actions after a takedown separately). (*See* Doc. No. 56, at 14–15 (describing the use of force in two parts: the takedown and the Officers "jumping on top of him while he was already face down and not going anywhere").)

### a.  Takedown

The first application of asserted excessive force occurred when Officers Smith and Karac grabbed Malone and took him to the ground. (Doc. No. 47, at 12–13 (explaining Officers Smith and Karac's actions).) Below, the Court examines the Sixth Circuit's excessive force case law to determine whether a constitutional violation occurred. Collecting principles from past cases, a reasonable jury could resolve at least two of the *Graham* factors in Malone's favor.[5] Nonetheless,

---

[5] Malone claims the takedown caused him to strike his head (Doc. No. 56, at 15; Doc. No. 47-6, at 24:18–20), while the Officers claim that "Malone was taken to the floor of his porch without striking his head on the pillar of his porch." (Doc. No. 59, at 3 (collecting record cites).) On this score, the Officers argue that Malone "attempts to create a genuine dispute of fact to be litigated in this case by relying on his deposition testimony which is blatantly contradicted by the video evidence." (*Id.* at 2.) As explained above, though, available video footage does not conclusively resolve the parties' dispute. Ultimately, because the Officers are entitled to immunity for lack of a clearly established right, the factual dispute of whether Malone struck his head or not does not affect the outcome here.

as the Court's analysis reveals, the Officers were confronted with facts that do "not fit cleanly within [the Sixth Circuit's] existing excessive force case law[.]" *King v. City of Rockford*, 97 F.4th 379, 397 (6th Cir. 2024) (citation and quotation marks omitted). Accordingly, the Officers are entitled to immunity for Malone's takedown.

*Severity of the Crime.* The first *Graham* factor supports, to an extent, the Officers' use of force. "The severity of the crime at issue is relevant . . . because it speaks to the governmental interests" in effectuating an arrest. *Ellis v. Timm*, 504 F. Supp. 3d 726, 736 (N.D. Ohio 2020). The more severe the crime, the greater the interest in using force to arrest a suspect. *Id.*; *Shumate v. City of Adrian, Michigan*, 44 F.4th 427, 442 (6th Cir. 2022) ("[W]eighing the government's interest in subduing a suspect assists in our determination of an offense's severity; this question acts as a proxy for public safety concerns.").

With that in mind, the Officers argue "that the crimes at issue [] were sufficiently severe to justify the minimal force used[.]" (Doc. No. 47, at 15.) They, in part, rely on Malone's conviction for obstructing official business. (*Id.*) The Officers claim that Malone was "uncooperative and hostile" during the Officers' investigation, and that he "attempted to flee the scene" by entering his home. (*Id.*)

It is unclear from the record whether Malone's obstruction conviction stems from his non-cooperation before the use of force, after, or some combination of the two. To the extent the Officers suggest Malone's obstruction or resistance *after* he was taken down justifies their initial use of force, the Court finds such an argument circular. *See Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) (discounting consideration of crimes that officer "could not have known of . . . at the time" force was used). And even if the obstruction offense was based on Malone's actions before the takedown, the video shows Malone was animated and non-cooperative, but not violent.

12

(*See, e.g.*, Smith BWC, at 6:55–9:10.) Non-violent obstruction offenses generally do not support the use of force. *See, e.g.*, *Bell v. Korkis*, No. 2:19-cv-13565, 2024 WL 69807, at *7 (E.D. Mich. Jan. 5, 2024) (finding "crime of obstruction" stemming from refusal to produce identification "not severe and [] far less problematic than other crimes that are considered non-severe"); *Dudas v. Engel*, No. 1:19-cv-2565, 2021 WL 2000579, at *13 (N.D. Ohio May 17, 2021) (finding severity of obstruction offense to weigh in plaintiff's favor when she swore at officer and attempted to reenter home); *Carter v. Colerain Twp.*, No. 1:05-cv-163, 2007 WL 869727, at *13 (S.D. Ohio Mar. 20, 2007) ("[Plaintiff's] alleged crimes of disorderly conduct and resisting arrest were not severe" particularly when he "did little more than loudly tell the officers to get out of his house"); *Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015) (finding that a "jury could conclude that disorderly conduct is not a 'serious' crime when determining whether an officer used excessive force in effecting the arrest for that crime" even when plaintiff was agitated and refused to cooperate with an investigation (citations omitted)). The non-severe nature of Malone's obstruction offense thus does little to move the needle on the reasonableness of Officers Smith and Karac's initial use of force.

The Officers, however, also point out that they were "investigating a claim of aggravated menacing involving a firearm, a first-degree misdemeanor, when they arrested [Malone]." (Doc. No. 47, at 14.) This Court has previously recognized the potential seriousness of aggravated menacing. *See, e.g.*, *Cook v. Kata*, 4:14-cv-1283, 2015 WL 6964590, at *6 (N.D. Ohio Nov. 10, 2015). On balance, the severity of the suspected menacing offense lends some weight to the decision to use force.

*Immediacy of Threat.* The second *Graham* factor focuses on the "immediate safety threat posed by the suspect to police and others[.]" *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 867 (6th

13

Cir. 2020). On that score, the Officers argue that there is "no dispute that [Malone] posed an immediate threat[.]" (Doc. No. 47, at 15–16.) They point to his demeanor and lack of cooperation, along with the possibility that he may have had access to a gun. (*Id.*) Malone counters that he posed "no threat to himself, the officers, or others[.]" (Doc. No. 56, at 14.)

Here, several facts favor Malone. He did not threaten the Officers and repeatedly denied possessing a weapon. (*See, e.g.*, Gregg BWC, at 3:55–4:20, 4:36–4:43, 5:13–5:55.) Hardges corroborated that assertion. (*See, e.g., id.* at 3:55–4:05.) Malone lifted his shirt and took his cell phones out of his pockets several times in an effort to prove he did not have a gun on his person. (*See, e.g.*, Doc. No. 47-6, at 23:1–3.) *Cf. Fox v. DeSoto*, 489 F.3d 227, 236–37 (6th Cir. 2007) (finding takedown justified where police officers grabbed plaintiff, who responded by stiffening and reaching for his side where he had a gun holstered). Indeed, Officer Smith's contemporaneous incident report seems to suggest that force was employed because he "felt that [Malone] was no longer going to cooperate with officers' investigation and attempt to leave the scene." (Doc. No. 47-1, at 15.) This is all underscored by the fact that the Officers spoke to Malone for about six minutes before initiating a takedown, and that Malone explicitly disclaimed any intention to harm the Officers. (*See, e.g.*, Karac BWC, at 2:50–9:05.) In short, there is some evidence from which a jury could conclude Malone posed no immediate threat. To be sure, the Officers faced competing stories about who possessed a gun. (Doc. No. 47-1, at 2, 13.) But, at this stage, those facts must be considered in tandem with the facts identified above.

At least some case law seems to favor Malone. Consider *Ferguson v. City of Taylor*, 771 F. Supp. 3d 962 (E.D. Mich. 2025), *appeal filed*, No. 25-1378 (Apr. 18, 2025). There, officers were dispatched to a dispute between two individuals involving a gun. *Id.* at 969–70. Each told conflicting stories about what had happened. *Id.* The plaintiff, for his part, denied threatening anyone

14

with a gun, but admitted to having a firearm in his home. *Id.* The officers also believed there were other firearms in the house. *Id.* When officers arrested the plaintiff, they did so without a warrant "because the situation posed an imminent danger to the officers[.]" *Id.* at 973.[6]

The judge in *Ferguson* was not convinced that the plaintiff posed an immediate threat. *Id.* at 974. First, although the officers faced contradictory stories of who had a weapon, the plaintiff in *Ferguson*—like Malone—flatly denied threating anyone with a gun. *Id.* And a third party in *Ferguson* corroborated the plaintiff's story, just as Hardges vouched for Malone's assertion that he did not brandish a weapon. *Id.* As for the fact that there may have been a gun in the house, the judge in *Ferguson* concluded that "[e]vidence that firearms are within a residence, by itself, is not sufficient to create an exigency" because there is no immediate threat to officers. *Id.* (citation and quotation marks omitted) (collecting cases). That was particularly true because the plaintiff "neither acted against nor threatened the officers." *Id.*; *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997–98 (6th Cir. 1994) (finding no immediate threat to justify exigency exception when arrestee was earlier observed carrying a weapon and retreated into his home, but did not point it at officers or verbally threaten officers). When an arrestee "refuse[s] to follow police orders and may be in possession of a weapon," the use of force may be justified. *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017); *Watson v. City of Marysville*, 518 F. App'x 390, 393 (6th Cir. 2013) ("[N]o clearly established right of a suspect to be free from tasing where he or she disobeys police orders and may be in possession of a weapon."). But here the Officers do not contend that they gave Malone any orders or that he disobeyed them.

---

[6] The Court recognizes that the relevant analysis in *Ferguson* concerned the plaintiff's right to be free from a warrantless entry of his property and the applicability of the exigency warrant exception. Nonetheless, because the central inquiry in resolving that issue was whether the plaintiff posed an immediate threat to the officers, the Court finds *Ferguson*'s reasoning helpful in determining if a reasonable jury could find Malone not to have posed an immediate threat, particularly given the similar facts.

The Officers seem to argue that Malone's behavior created an immediate threat. (Doc. No. 47, at 16.) While he may have been "rude, annoying, untoward, and uncooperative[,]" his lack of cooperation, agitation, and profanity, "unaccompanied by threats, fall short of the prototypical behavior that would make an officer fear for his physical safety." *Shumate*, 44 F.4th at 444–46 ("Not every profane uttering or rude gesture by a free citizen, even if it may seem unnecessary to a police officer, justifies using force on an otherwise non-threatening individual."); *King*, 97 F.4th at 394–95 (6th Cir. 2024) ("Although King may have been loud and argumentative, a reasonable jury could otherwise find him non-threatening, indicating that the takedown was unreasonable to maintain control of the situation." (citation and quotation marks omitted)).

*Gaddis ex. rel Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004) does not resolve the issue either. There, an officer "grabbed [the plaintiff] by the collar and pulled him slightly away from [a] car." *Id.* at 767. In analyzing that application of force, the Sixth Circuit concluded that the officer's "reasonable need to prevent [the plaintiff] from fleeing and to discern whether he was armed justified his action." *Id.* at 772. But in that case, the officer was dealing with a suspect who had already refused orders to stop and had been given an instruction to remove his hands from his pockets. *Id.* Here, by contrast, Malone was never given any commands by the Officers. And even if *Gaddis* stands for the proposition that an officer can use *some* force to prevent a suspect from walking away or to effectuate a frisk, it does not support the *level* of force used by Officers Smith and Karac. Tackling an individual goes far beyond grabbing an individual and pulling him slightly.

*Simmonds v. Genessee Cnty.*, 682 F.3d 438 (6th Cir. 2012) is also off point. There, officers received a report that the plaintiff may have been armed. *Id.* at 440–41. But that was not the only fact that justified their use of force. Unlike Malone, the plaintiff in *Simmonds* had threatened to kill others, "was displaying mentally unstable behaviors, and was possibly suicidal." *Id.* at 445.

16

Moreover, when officers "came into contact with [the arrestee], he refused to comply with their request to raise his hands and exit his truck, and instead shifted the truck into reverse and fled into a heavily-wooded area[.]" *Id.* After fleeing from police, he later "ignored repeated orders to show his hands[.]" *Id.* Explicit threats and refusing to follow police orders are different from what the Officers faced here. In light of those cases and viewing the record in the light most favorable to Malone, there is at least some evidence from which a reasonable juror could conclude that Malone was animated, but not an immediate threat. *See Chappell*, 585 F.3d at 909.

All that said, the Court acknowledges that, just before the takedown, the videos show that Malone entered his home for several seconds. During that time, the Officers could only guess what Malone was doing, especially because they were called to the scene to investigate a report of someone with a gun. And Officer Smith explains in his declaration that he was concerned with "Malone's actions in quickly entering and exiting his home, where a gun may have been present[.]" (Doc. No. 47-1, at 2.) That consideration cuts in favor of the Officers, particularly because "[t]he critical factor" in the excessive force context "is whether the suspect presented an immediate danger to the officers or others." *Williams v. City of Canton*, No. 5:23-cv-655, 2025 WL 949370, at *6 (N.D. Ohio Mar. 30, 2025) (quoting *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020)). Ultimately, as explained below, because the law was not clearly established, the Court need not decide how this factual nuance affects the analysis of the immediate threat factor.

*Active Resistance or Evasion of Arrest.* The third *Graham* factor could cut in Malone's favor. When analyzing this factor, the relevant inquiry is whether a suspect was actively or passively resisting. *Goodwin*, 781 F.3d at 323. "[W]hen a suspect actively resists arrest, the police can use [force] to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1154 (6th Cir. 2022) (citation and quotation

17

marks omitted). Active resistance "can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." *King*, 97 F.4th at 395–96 (cleaned up). "By contrast, when individuals behave nonviolently and are merely noncompliant, [the Sixth Circuit] has found that they are only passively resisting arrest, which weighs against the reasonableness of a use of force." *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1005–06 (6th Cir. 2024) (collecting cases).

At the outset, the Court notes that Malone was never ordered to stay outside or told that he was being detained (Doc. No. 47-6, at 72:16–20), and the "general consensus" in the Sixth Circuit "is that officers cannot use force . . . on a detainee who. . . is not told he is under arrest[.]" *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) (collecting cases); *Saalim*, 97 F.4th at 1005 ("As an initial matter, this Court has held that when an officer has not told an individual that he is under arrest, this enhances the likelihood of a finding of excessive force"); *Goodwin*, 781 F.3d at 326 (6th Cir. 2015) ("[A]bsent a statement that [the plaintiff] was under arrest or an order to get on the ground or something similar, it was not objectively apparent that the Officers intended to take [the plaintiff] into custody, or that he was not free to remain in his own home."); *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *4–5 (6th Cir. Mar. 15, 2023) (concluding that the plaintiff "was not actively resisting arrest, particularly considering the plausible inference that he did not know he was being arrested"); *Sevenski v. Artfitch*, No. 21-1391, 2022 WL 2826818, at *4 (6th Cir. July 20, 2022) (finding a jury question as to whether takedown was reasonable when it was "undisputed both that [the plaintiff] was never told that he was under arrest prior to [the officer's] use of force, and that he was never warned that force would be used against him if he did not return to his car."). In other words, Malone "could not have been actively resisting a command he was never given[.]" *Saalim*, 97 F.4th at 1006.

Indeed, defining Malone's pre-arrest conduct as resistance would be troubling in this context, where Malone attempted to enter his own home. *Goodwin*, 781 F.3d at 327 ("A holding that a simple refusal to exit one's own home—and surrender the heightened Fourth Amendment protections it provides—constituted active resistance of an officer's command sufficient to justify a tasering would undermine a central purpose of the Fourth Amendment.").

And even if Malone's pre-takedown conduct is properly characterized as resisting arrest, it likely falls on the passive side of the line. In this respect, *Goodwin* is instructive. There, police officers were dispatched to an apartment for a noise complaint and the plaintiff was "agitated by the officers' presence[.]" 781 F.3d at 318. When officers requested that the plaintiff step outside, he refused. *Id.* at 319. The officers then entered the apartment and tased the plaintiff. *Id.* The Sixth Circuit found the plaintiff's refusal to cooperate and leave his home to be passive resistance. *Id.* at 324; *see also Reed v. Campbell Cnty., Kentucky*, 80 F.4th 734, 749 (6th Cir. 2023) ("[W]e conclude that refusing to permit police officers to enter one's home or refusing to continue an interview with an officer outside of one's home also cannot constitute 'active resistance' sufficient to justify a use of force. . . . [The plaintiff's] retreat into his home was passive resistance at worst and is better characterized as no resistance at all.").

The Officers repeatedly point out that Malone refused to identify himself or answer their questions. (*See, e.g.*, Doc. No. 47, at 16.) Even still, the "common thread" in Sixth Circuit caselaw "is that noncompliance alone does not indicate active resistance[.]" *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (collecting cases). So while Malone no doubt refused to cooperate with the Officers' investigation, that alone does not justify the use force. *See, e.g.*, *Goodwin*, 781 F.3d at 324 (finding no active resistance when plaintiff refused to cooperate with police investigation by withdrawing into his apartment); *Reed*, 80 F.4th at 749 (finding no active

resistance even though plaintiff refused to "facilitate the officers' request to speak with others in the house and attempted to end the encounter"); *Dudas*, 2021 WL 2000579, at *3, 13 (denying summary judgment when officer executed takedown without warning, despite the fact that plaintiff was yelling, agitated, and "immediately began to swear at [the officer] and told him to leave her property").

While the Officers are correct that verbal hostility coupled with a failure to comply with police orders can rise to the level of active resistance (Doc. No. 47, at 17), the verbal hostility or antagonism that might take resistance from passive to active is generally associated with verbal threats. *Cf., e.g., King*, 97 F.4th at 396 (drawing a line between argumentative and noncompliant speech on the one hand, and threats or hostility on the other (collecting cases)); *Shumate*, 44 F.4th at 448 ("Shumate's verbal jabs and rude hand gestures were not threatening in a manner that would amount to active resistance absent something more, such as overtly threatening language."); *Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 96 (6th Cir. 2012) (finding active resistance where suspect was erratic and threatened to fight the officers so that they would have a reason to use force). In other words, verbal hostility sufficient to justify the use of force requires more than simply being uncooperative, rude, or using profanity—all that Malone is accused of here.

*Totality of the Circumstances.* In the end, the "bottom-line inquiry is whether the totality of the circumstances justifies a particular level of force." *Wright*, 962 F.3d at 865 (citation and quotation marks omitted). To be sure, the Officers confronted a fluid situation. "But even if a situation is tense, uncertain, and rapidly evolving, that does not [inoculate] an officer from a charge that he crossed the line from subduing an individual to assaulting him." *Lawler*, 268 F. App'x at 387 (citation and quotation marks omitted). On the one hand, the Officers were investigating a serious crime and a report that someone had a gun. On the other, Malone denied that he ever had

20

a gun, the Officers never observed him with a weapon, he was never told he was under arrest, and although he was loud, profane and did not answer questions, he never threatened the Officers. Ultimately, the Court need not conclude whether those facts justified the takedown, because even if they did not, the law was not clearly established.

*Clearly Established.* The possibility that the force applied was unreasonable is not enough—Malone must also show that Officers Smith and Karac's actions violated clearly established law. *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020) ("The plaintiff bears the burden of showing that a right was clearly established at the time of an alleged injury."). Even when all the factual disputes above are resolved in Malone's favor and there is a determination that constitutional violation did occur, he has not carried that burden.

"The contours of [a constitutional] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). To be sufficiently clear, "'existing precedent must [] place[] the statutory or constitutional question beyond debate.'" *Smith*, 874 F.3d at 944 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). In other words, "the question is whether the defendants had 'fair warning' that their actions were unconstitutional.'" *Cummings v. City of Akron,* 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).

As explained above, the Sixth Circuit's excessive force cases appear to reveal several well-established guideposts concerning the Officers' conduct here. First, as Malone points out (Doc. No. 56, at 17), "[i]t was well-established at the time of the incident in this case that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force." *Smith*, 874 F.3d at 945 (citation omitted). That is particularly true for an

21

individual who is not told he is under arrest. *See, e.g.*, *Grawey*, 567 F.3d at 314; *Kent*, 810 F.3d at 390. Second, "noncompliance alone does not indicate active resistance[.]" *Eldridge*, 533 F. App'x at 535 (collecting cases). Third, non-threatening, verbal antagonism does not render an arrestee an immediate threat. *See Shumate*, 44 F.4th at 444; *King*, 97 F.4th at 395.

Yet, those rules do not account for the lingering threat of a weapon potentially accessible to the arrestee. *Cf. Smith*, 874 F.3d at 945 ("If Smith . . . was unarmed, and if no evidence was adduced that he posed a threat to himself or to others, [an officer's] forcible handcuffing of him would be excessive and in violation of well-established constitutional principles); *Kent*, 810 F.3d at 391 (it was "undisputed that [the plaintiff] was unarmed and made no evasive movements to suggest he had a weapon"); *Shumate*, 44 F.4th at 444 (highlighting the lack of immediate threat when nothing "suggest[ed] possession or intent to possess a weapon"); *King*, 97 F.4th at 395 ("[N]othing in the record indicates that [the plaintiff] was armed[.]"); *Grawey*, 567 F.3d at 311 ("Grawey, who was unarmed, did not pose an immediate threat to the officers or to others when [an officer] sprayed him."). Malone has identified no cases that would have given Officers Smith and Karac fair warning that they could not execute a takedown given that important factual nuance.

Consider Malone's cited cases. Although *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365–66 (6th Cir. 2017) involved a weapon, the officer there was alone, responding to an active robbery in a high crime area, and confronted an individual running toward him at close range with a gun. And Malone's other cited cases concern materially different applications of force and did not involve the threat of a weapon. *See Alkhateeb v. Charter Twp. of Waterford*, 190 F. App'x 443, 451–52 (6th Cir. 2006) (finding excessive force when the plaintiff complied with an officer's demands and "while on the ground with his hands behind his head, [the officer] asked [the plaintiff] if he was 'Arab,' and then repeatedly kicked him[,]" "yelled at him[,]" and "pointed his gun at [the

plaintiff's] head and pressed the gun to his temple"); *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513–15 (6th Cir. 2006) (finding excessive force based on overly tight handcuffs and a slap which "was not to protect [the officer], other officers, or the public"); *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 35–37 (6th Cir. 2005) (finding excessive force based on conduct *after* handcuffing occurred).

While the Court recognizes that there need not be a case directly on point, *see Cummings*, 418 F.3d at 687, the lack of a more analogous case is especially relevant here, because often "[t]he critical factor" in the excessive force context "is whether the suspect presented an immediate danger to the officers or others." *Williams*, 2025 WL 949370, at *6 (quoting *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020)). Without more specific guidance, "[e]ven accepting all of [Malone's] factual allegations as true, there is nothing obvious about what" Officers Smith and Karac were supposed to do. *Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005) (citation and quotation marks omitted).

Put differently, the situation confronted by the Officers "does not fit cleanly within [the Sixth Circuit's] existing excessive force case law[.]" *King*, 97 F.4th at 397 (citation and quotation marks omitted). Instead, the Officers' conduct sits on the "hazy border between excessive and acceptable force" where "the proper course is to grant summary judgment to [] officers, even if the court would hold [their] conduct unconstitutional in hindsight." *Rudlaff*, 791 F.3d at 644 (citations and quotation marks omitted). Accordingly, they are entitled to immunity for the takedown because Malone has not carried his burden of showing that his right to be free from a takedown—on these facts—was clearly established.

            b.      Use of Force After Takedown

According to Malone, the second application of excessive force occurred when the Officers "jump[ed] on top of him while he was already face down and not going anywhere[.]" (Doc. No.

23

56, at 14–15.) He testified at his deposition that he "just hit the ground, and put [his] hands behind [his] back." (Doc. No. 47-6, at 84:14–15, 85:2–3.) The Officers counter that their actions were reasonable because Malone "actively resisted [their] efforts to handcuff him." (Doc. No. 47, at 17.) They back that assertion up with Officer Gregg's and Officer Karac's use of force reports, which explain that Malone was actively resisting efforts to be handcuffed. (Doc. No 47-3, at 9; Doc. No. 47-4, at 7.)

It is clearly established that if Malone was resisting efforts to be handcuffed, "manually forcing his hands behind his back" was reasonable. *Earnest v. Genesee Cnty., Michigan*, 841 F. App'x 957, 960 (6th Cir. 2021). In other words, if "[Malone] actively resist[ed] arrest and refus[ed] to be handcuffed, a reasonable jury applying the law of our circuit could conclude only that the officers were constitutionally able to use the force they did to subdue him." *Rudlaff*, 791 F.3d at 642. Here, the body camera videos show Malone struggling with the Officers as he was taken to the floor, arguing with the Officers, and moving his body once he was on the ground. (*See, e.g.*, Gregg BWC, at 9:16–10:05; Smith BWC, at 9:25–10:15; Edwards BWC, at 9:17–10:00.) As a result, the Officer's manually moved Malone's arms behind his back, briefly placed a knee on his back, and ensured that his arms were secured until the handcuffs were applied. (*See, e.g.*, Gregg BWC, at 9:16–10:05; Smith BWC, at 9:25–10:15.) The Officers informed Malone that he was under arrest and directed him to stop resisting. (*See, e.g.*, Smith BWC, at 9:31–9:33.) Officer Gregg's knee was only on Malone's back for about 10 seconds to maintain control, and removed well before the handcuffs were applied. (*See, e.g.*, Gregg BWC, at 9:16–10:05; Smith BWC, at 9:25–10:15; Edwards BWC, at 9:17–10:00; Doc. No. 47-3, at 9.) The Officers' brief use of minimal force to ensure that Malone—who was now clearly under arrest—was secured was not unreasonable. *See Williams v. City of Grand Rapids*, 672 F. Supp. 3d 395, 409–10 (W.D. Mich.

24

2023) (finding a ten second application of a knee to the suspect's back while suspect was being handcuffed be reasonable, even if prior takedown was unreasonable); *Goodrich v. Everett*, 193 F. App'x 551, 556 (6th Cir. 2006) (finding "kneeing" of suspect to be reasonable where suspect was not handcuffed and the totality of the circumstances suggested an intent to resist); *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (finding use of force reasonable when suspect "twisted and turned some" when officers tried to apply handcuffs).

Malone also seems to argue that the Officers applied unnecessary force after he was handcuffed. Malone is correct that "'the law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized.'" (Doc. No. 56, at 16 (quoting *Alkhateeb*, 190 F. App'x at 452).) And Malone relies on a host of cases in which officers applied force *after* a suspect had been subdued or offered no resistance. *See, e.g.*, *Bultema*, 146 F. App'x at 37 ("[W]e have also held for more than twenty years that it is clearly established in this circuit that a totally gratuitous blow to a suspect *who is handcuffed and offering no resistance* violates the Fourth Amendment." (citation and quotation marks omitted, emphasis added)). That is not what happened here. As explained above, available video footage shows the Officers applied force while handcuffing Malone, and once he was secured, the application of force ceased.

In sum, Officers Smith, Gregg, Karac, and Edwards are entitled to immunity for the handcuffing, and Officers Smith and Karac are entitled to immunity for the takedown. And because Malone has not alleged that Sgt. Patalon was involved in the application of force at all, he is entitled to immunity for both the takedown and conduct after the takedown. *See Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) ("[§] 1983 imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury.").

25

### 2.    *Deliberate Indifference Claim Against the Officers*

Malone also alleges that the Officers violated his constitutional right to receive adequate medical care by failing to render aid after his arrest. To begin, Malone seems to rely on both the Eighth and Fourteenth Amendments to support his medical claim. (*See* Doc. No. 1 ¶¶ 53–61 (referencing "cruel and unusual punishment" and "deliberate indifference").) As the Officers point out, however, the Eight Amendment is inapplicable in cases involving pretrial arrestees. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005). Malone does not contest that point, and the Court will construe his deliberate indifference claim as arising solely under the Fourteenth Amendment Due Process clause.

"The Fourteenth Amendment requires adequate medical care for persons 'injured while being apprehended by the police.'" *Hicks v. Scott*, 958 F.3d 421, 438 (6th Cir. 2020) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983)). A constitutional violation occurs when a police officer "acts with deliberate indifference to [an arrestee's] serious medical needs." *Id.* (citation and quotation marks omitted). That deliberate indifference standard includes an objective and subjective requirement. *Id.* Here, Malone has not offered sufficient evidence to create a dispute of fact as to either.

### a.    Objective Indifference

Start with the objective prong, which requires a plaintiff to "show a 'sufficiently serious' medical need." *Hicks*, 958 F.3d at 438 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). A sufficiently serious medical need is one "so obvious that even a layperson would easily recognize the necessity for a doctor's attention . . . because such an injury presumptively gives rise to a substantial risk of serious harm." *Id.* (cleaned up); *Hodges v. Abram*,

138 F.4th 980, 988 (6th Cir. 2025) (recognizing that obviousness is a "key factor" in analyzing the objective requirement of a deliberate indifference claim (citation omitted)).[7]

    None of Malone's injuries rise to that level. To be sure, Malone alleges that he experienced various injuries—including a brain aneurysm, closed head injury, acute post-traumatic headaches, sprains, strains, pain, and scrapes. (Doc. No. 56, at 19 (citing Doc. No. 56-3 (Haynesworth Report).) But it is not enough that Malone sustained those injuries. Instead, in the deliberate indifference context, the injury must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention[.]" *Hicks*, 958 F.3d at 438 (cleaned up).

    On that score, Malone offers little argument and no evidence. He testified that he told the Officers that his head, back, and arm hurt after he was arrested. (*See, e.g.*, Doc. No. 47-6, at 27:3–5.) It also appears that he suffered some cuts or scrapes to his hands. (Doc. No. 47-5, at 2, 104–106.) Malone argues that his injuries were "apparent" and that, because he "was thrown to the ground, hit his head on the pillar of his porch, and jumped on by four adult men," a jury could "reasonably believe that there was a substantial risk of serious harm if Malone did not receive medical attention." (Doc. No. 56, at 18.) But Malone offers no explanation or evidence as to why a reasonable person in the Officers' positions would conclude that he faced an obvious risk of serious harm from any of the injuries he sustained. That shortcoming is amplified by the evidence that is in the record. Malone testified, for example, that he had no visible injuries (Doc. No. 47-6, at 90:23–91:1), and that he never lost consciousness. (*Id.* at 98:3–17.)

---

[7] Alternatively, a plaintiff can show that an injury is sufficiently serious by offering "verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Hodges*, 138 F.4th at 990 (citation and quotation marks omitted). Based on Malone's argument concerning the objective prong of the deliberate indifference test, it does not appear he is advancing such a theory. (Doc. No. 56, at 19.) But if he were, his medical evidence would be insufficient because he has not pointed to the effect of any delay in treatment. (*See, e.g.*, Doc. No. 56-3.)

27

Without more, Malone has failed to generate a fact dispute about whether he suffered an obvious injury. *Cf. e.g.*, *Corhn v. Cooley*, No. 1:22-cv-282, 2024 WL 5384205, at *3 (W.D. Mich. Sept. 24, 2024) (finding no obvious injury when plaintiff reported headache and dizziness and later was diagnosed with a brain aneurysm), *report and recommendation adopted,* 2025 WL 350380 (W.D. Mich. Jan. 31, 2025); *Mathis v. McInnis*, No. 21-cv-10734, 2024 WL 1858546, at *8 (E.D. Mich. Apr. 29, 2024) (finding no obvious injury when plaintiff fell and presented with a headache, and slow verbal responses, and was later diagnosed with a concussion and brain bleed); *Wagle v. Corizon*, No. 19-cv-13787, 2023 WL 2749147, at *5 (E.D. Mich. Mar. 31, 2023) (finding no obvious injury when plaintiff informed nurse that he had a headache, cuts, soreness, and dizziness, but was later diagnosed with a concussion); *Block v. Glenn*, No. 4:18-cv-4103, 2019 WL 2766903, at *5 (W.D. Ark. July 2, 2019) (finding no objectively severe injury when plaintiff offered "no proof" that his back sprain was a serious medical need); *see also Lockett v. Suardini*, 526 F.3d 866, 877 (6th Cir. 2008) ("[M]inor cuts and lacerations do not support his claim that [plaintiff's] injuries were, objectively speaking, sufficiently serious to necessitate medical treatment.").[8] Because Malone has offered no evidence that he suffered an obvious injury, his deliberate indifference claim fails.

b.    Subjective Indifference

Even if Malone had satisfied the objective prong, he would still need to show that each defendant "acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine*, 60

---

[8] Some of these cases involve claims brought by prisoners arising under the Eighth Amendment. Historically, Eighth Amendment and Fourteenth Amendment deliberate indifference claims were evaluated "under the same rubric." *Helphenstine*, 60 F.4th at 315 (citation and quotation marks omitted). That changed when the Sixth Circuit modified the subjective requirement of a Fourteenth Amendment deliberate indifference claim. *Id.* at 315–16 (citation and quotation marks omitted). Nonetheless, because that modification was not focused on the objective requirement, these cases remain persuasive.

F.4th at 317 (detailing recent changes to the subjective component of the deliberate indifference standard (cleaned up)).

Malone has not shown that the Officers were reckless. As explained above, Malone has offered no evidence to suggest the Officers were aware of any risk of harm, or that they reasonably should have been. And, even if the Officers should have perceived a risk, there is no evidence that they acted recklessly in responding. The Sixth Circuit has repeatedly held that "[w]hen police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it." *Wilkerson v. City of Akron*, 906 F.3d 477, 483 (6th Cir. 2018) (cleaned up); *Hicks*, 958 F.3d at 439 (same). As Malone testified (Doc. No. 47-6, at 34:3–4), that is exactly what the Officers did here. (*See, e.g.*, Doc. No. 47-1, at 15.)

Malone contends that the Officers' "conduct fits squarely within [] precedent" holding that "a police officer who calls paramedics for an injured suspect violates the Constitution when he can safely attend to the suspect's obvious injuries, but instead does nothing." (Doc. No. 56, at 20.) In effect, he seems to suggest that the Officers delayed in calling the ambulance or rendering obvious, necessary treatment themselves. (*Id.*) But he offers no evidence to back up either conclusory assertion. In fact, his own testimony makes clear that the Officers "automatically" summoned an ambulance after arresting Malone, and that he suffered no obvious injuries. (Doc. No. 47-6, at 34:3–4, 90:23–91:1, 100:17–21.)

In any event, the cases he cites in support of his argument are distinguishable. In *Jones v. City of Cincinnati*, 521 F.3d 555, 558 (6th Cir. 2008), for example, officers failed to help an individual who was handcuffed, facedown, and not breathing for a prolonged period of time, so long in fact that his skin began to change color. Similarly, in *Scozzari v. Miedzianowski*, 454 F.

29

App'x 455, 464 (6th Cir. 2012), officers failed to render aid to a suspect whom they had just shot, even though he had no pulse and officers "observed a large pool of blood near his neck and heard gurgling sounds coming from his mouth." Much the same in *Est. of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005), the plaintiff was bleeding, appeared unable to breath, and "each officer viewed [the plaintiff] in significant physical distress, yet made no attempt to summon or provide any medical care until several minutes later[.]" In all those cases there was an obvious risk of harm and the aid to be rendered was clear. Here, by Malone's own admission, there were no obvious injuries or symptoms demanding immediate treatment. (*See, e.g.*, Doc. No. 47-6, at 90:23–91:1.) The differences between Malone's cited cases and the record here are apparent.

In the end, because Malone has failed to offer evidence in support of either the objective or subjective requirements of his deliberate indifference claim, he cannot make out a constitutional violation, and the Officers are entitled to qualified immunity and summary judgment.

### B. *Monell* Claim against the City and Department

Malone also brings a *Monell* claim against the City and the Department, alleging that they had a policy or custom that caused the violation of his rights. For different reasons, both claims fail.

#### 1. *Akron Police Department*

The Department argues that it not sui juris, and therefore not subject to § 1983 liability. (Doc. No. 48, at 9.) In his opposition, Malone concedes that the Department is not amenable to suit. (Doc. No. 55, at 11.) Accordingly, summary judgment is granted to the Department on Malone's *Monell* claim. *See Marshall v. Toledo Police Dep't*, No. 3:23-cv-2054, 2024 WL 3819624, at *2 (N.D. Ohio Aug. 14, 2024) ("Defendant is correct that the City of Toledo Police Department is not sui juris, that is, not an entity subject to suit under § 1983." (internal quotation marks omitted) (collecting cases)).

30

2.      *City of Akron*

A municipality—like the City—can only be held liable under § 1983 in "a narrow set of circumstances[.]" *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). "A municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, solely because it employs a tortfeasor." *Id.* (citation, quotation marks, and italics omitted). Instead, to survive summary judgment, a plaintiff must show that the municipality was the "moving force behind the injury alleged" because it had a "policy or custom" that led to a violation of plaintiff's rights. *Id.* (citations and quotation marks omitted). A plaintiff can show the existence of policy or custom by proving "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (citation and quotation marks omitted).

As the City points out, "[b]ased on the allegations in the [c]omplaint, it is unclear which theory of *Monell* liability [Malone] is pursuing." (Doc. No. 48, at 11.) As best the Court can tell from the current record, Malone focuses solely on the City's potential liability as it concerns excessive force. (Doc. No. 55, at 15–19.)[9] On that score, he appears to contend that the City is liable under three avenues identified above: custom, ratification, and failure to train. (*Id.*) Each of those theories comes up short.

a.      Custom

First, Malone contends that "the use of inaccurate investigative reports that rubber-stamp officers' use of force decisions without genuine scrutiny" demonstrates an illegal custom of

_____

[9] Even if Malone was pursuing a *Monell* claim premised on his medical care, that claim would fail as a matter of law because he has not set forth a viable deliberate indifference claim. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation." (citation omitted))

31

"routine[ly] generate[ng] [] false or misleading reports[.]" (*Id.* at 16–17.) A policy or custom is broadly defined to include an unwritten "policy of inaction." *Martinez v. Wayne Cnty., Michigan*, --- F.4th ----, 2025 WL 1733451, at *9 (6th Cir. June 23, 2025). Even still, Malone must establish, among other things, "the existence of a clear and persistent pattern of illegal activity[.]" *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (cleaned up). That requires Malone to "reach beyond the facts of this case to show any possibility of a pattern." *Id.* at 434.

He has not done so. Malone argues that "[t]he evidence demonstrates that the City's official procedures and unwritten customs governing the review of use-of-force incidents permit—if not encourage—investigating officers or supervisors to prepare reports that are designed to justify an officer's use of force, rather than to provide an impartial and accurate account of the incident." (Doc. No. 55, at 15–16.) But, in making that claim, he offers no evidence of other instances of City police officers completing inaccurate reports. He simply asserts—with no evidentiary backing—that the City "was or should have been aware that its use-of-force reporting procedures permitted biased or inaccurate reporting by supervisors, and that [the] system failed to detect or correct inaccuracies." (*Id.* at 17.) Without evidence of other instances of misconduct, Malone has not created a genuine issue of fact concerning the existence of an illegal City custom. *See, e.g.*, *Pineda*, 977 F.3d at 495 ("Because municipal liability requires an unconstitutional policy or custom, we have held that an allegation of a *single* failure to investigate a single plaintiff's claim does not suffice." (emphasis in original, quotation marks and citation omitted)); *Thomas*, 398 F.3d at 434 (affirming summary judgment on *Monell* claim when plaintiffs "failed to show several separate instances of the alleged rights violation"). That dooms Malone's first theory of *Monell* liability.

### b.    Ratification

Malone next contends that the City ratified the Officers' excessive force. (Doc. No. 55, at 18.) That theory fails for a similar reason: Malone offers no evidence concerning prior

investigations conducted by the City, and "the allegedly inadequate investigation into [Malone's case] is not, on its own, enough to create municipal liability, even under a ratification theory." *Cretacci v. Hare*, No. 21-5786, 2022 WL 17176781, at *7 (6th Cir. Nov. 23, 2022) (citing *Pienda*, 977 F.3d at 495–96). Resisting that conclusion, Malone cites several district court cases in which a single insufficient investigation was found to constitute ratification. *See Wright v. City of Canton, Ohio*, 138 F. Supp. 2d 955, 966 (N.D. Ohio 2001); *Otero v. Wood*, 316 F. Supp. 2d 612, 627–28 (S.D. Ohio 2004). Since those cases were decided, though, the Sixth Circuit has "clarified the scope of [the] ratification theory[.]" *Pienda,* 977 F.3d at 495 (quotation marks omitted). *Pienda* made "clear, despite apparently contradictory language in other cases, that multiple inadequate investigations must be a part of a failure to investigate claim." *Abdoo v. Sheriff*, No. 3:19-cv-400, 2021 WL 877751, at *12 (N.D. Ohio Mar. 9, 2021). Because Malone points only to evidence concerning the "failure to investigate his own excessive-force claim and has made no attempt to 'show several separate instances of the alleged rights violation[,]'" his ratification theory fails. *Pienda*, 977 F.3d at 495 (quoting *Thomas*, 398 F.3d at 434).

c. Failure to Train or Supervise

Finally, Malone claims that the City failed to train or supervise the Officers in the proper use of force. (Doc. No. 55, at 18–19.) To withstand summary judgment on this theory of *Monell* liability, Malone must show that "1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson*, 925 F.3d at 834 (citation and quotation marks omitted).

The City homes in on the second requirement, arguing that Malone has failed to offer sufficient evidence from which a jury could find the City was deliberately indifferent. (Doc. No. 48, at 15–16.) Deliberate indifference "is a stringent standard of fault, requiring proof that a

33

municipal actor disregarded a known or obvious consequence of [its] action." *Jackson*, 925 F.3d at 836 (citation and quotation marks omitted). In this context, that standard can be met in two ways, one more common than the other. In the normal course, a plaintiff can show that a municipality "has failed to act in response to repeated complaints of constitutional violations by its officers." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (citation and quotation marks omitted). Less commonly, "evidence of a single violation of federal rights" can be sufficient, so long as it is "accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Jackson*, 925 F.3d at 836 (citations and quotation marks omitted).

Malone has done neither. As already explained, Malone has not shown a "pattern of similar constitutional violations by untrained employees" which "is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) (citation and quotation marks omitted). So, to the extent he pursues his failure to train theory on the first type of deliberate indifference, his claim fails as a matter of law. *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 410 (6th Cir. 2022) (affirming summary judgment and dismissal of failure to train claim when plaintiff did not identify a pattern of prior excessive force).

Absent evidence of a pattern, Malone must establish the City's "deliberate indifference under the seemingly rare single-incident theory." *Gambrel*, 25 F.4th at 410 (quotation marks and citation omitted). Even accepting that City employees "would regularly find themselves in circumstances where they would use force" (Doc. No. 55, at 19), the City has offered a bevy of evidence in how it trains its officers to handle excessive force situations. (*See, e.g.*, Doc. No. 48-1 (Wood Declaration).) Malone offers only cursory arguments and no evidence in support of his

assertion that the City's training programs are inadequate. Accordingly, there is no genuine dispute whether the City was deliberately indifferent, and Malone's failure to train theory necessarily fails as a matter of law.

Malone has not offered evidence to support a *Monell* claim under any theory.

### C.  Claims against the Doe Defendants

Malone also brings claims against unnamed John or Jane Doe defendants. (Doc. No. 1, at 2.) The defendants argue that those Does should be dismissed because they were never served, despite a more-than-year-long discovery period. (Doc. No. 47, at 22.) Malone agrees. (Doc. No. 56, at 20.) Accordingly, the John or Jane Doe defendants are dismissed.

## IV.  CONCLUSION

For the reasons explained above, the City and Department's motion is **GRANTED**, and the Officers' motion is **GRANTED**. This case is **DISMISSED.**

**IT IS SO ORDERED**

Dated: August 13, 2025

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

35